IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SAVAGE SERVICES CORPORATION, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL ACTION 20-0137-WS-N ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) |

**ORDER**

This matter comes before the Court on defendant's Partial Motion to Dismiss (doc. 49) and plaintiffs' overlapping Motion for Partial Summary Judgment (doc. 55). Consolidated briefing has been ordered and completed. (*See* doc. 59.) Both Motions are now ripe.

**I.    Relevant Background.[1]**

This action arises from an oil spill from a barge resulting from a mishap in the Jamie Whitten Lock on the Tennessee-Tombigbee Waterway on September 8, 2019. Plaintiffs, Savage Services Corporation and Savage Inland Marine, LLC (collectively "Savage"), owned and operated the inland towing vessel, M/V SAVAGE VOYAGER (the "Vessel"). (Doc. 39, ¶ 7.) On the day in question, the Vessel was pushing ahead two tank barges, including PBL 3422 (the "Barge"), entering the Jamie Whitten Lock (the "Lock"). (*Id.*, ¶ 8.) The United States Army Corps of Engineers ("USACOE") was responsible for operating the Lock at that time. (*Id.*, ¶ 2.)

---

[1]    For purposes of defendant's Motion to Dismiss, the well-pleaded facts in the Amended Complaint are accepted as true. For purposes of plaintiffs' Motion for Summary Judgment, the record is viewed in the light most favorable to defendant, with all reasonable inferences being made in defendant's favor. To the extent that these different standards cause the legal analysis of the two Motions to diverge in any material respect, this Order will recognize and address those differences. The Court notes, however, that while the parties spar about the propriety of considering the Government's proposed exhibits to its Motion to Dismiss, it is unnecessary to resolve that issue to adjudicate both Motions in their entirety.

Savage maintains that the lock master "began de-watering the lock chamber without notice or warning to the crew," without confirming that the tug and tow were within the miter walls, and without checking the mooring lines. (*Id.*, ¶ 10.) As a result, plaintiffs allege, the rake end of the Barge became caught on the north miter wall of the Lock. (*Id.*, ¶ 11.) Upon becoming apprised of the problem, the lock master was unable to stop the descent; therefore, the water level continued to descend, with the Barge eventually falling off the north miter wall. (*Id.*, ¶¶ 11-12.) The Barge's cargo tank was punctured, releasing crude oil into the lock chamber. (*Id.*, ¶ 13.) According to the Amended Complaint, Savage's litigation position is that the Barge damage "and resulting release of crude oil into the lock were caused solely and completely by the fault, neglect and lack of due care of the United States, through its agency, the USACOE," in various enumerated respects. (*Id.*, ¶ 18.) Plaintiffs insist that "[t]here was nothing the SAVAGE VOYAGER or her crew did or could have done to cause or contribute to this accident." (*Id.*, ¶ 20.) Savage goes on to allege that as a result of the USACOE's negligence, Savage suffered damages exceeding $4 million, the overwhelming majority of which took the form of "[e]nvironmental cleanup costs." (*Id.*, ¶ 21.) In other words, Savage was required to bear the initial expense of cleaning up the oil spill in the Lock. The central tenet of Savage's Amended Complaint is that the oil spill, and the resulting expenses incurred by Savage, were solely attributable to the lock master's negligence, for which the Government may be held liable.

On the basis of these and other factual allegations and legal theories, Savage brings claims against the United States for damages pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 30901 *et seq.* ("SAA"), and the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA").

In response to the Amended Complaint, the United States filed a Partial Motion to Dismiss. In that Motion, defendant sets forth the following arguments: (i) the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.* ("OPA"), does not allow the Government to be construed as a sole-fault third party, so a responsible party like Savage remains exclusively and wholly liable for oil-spill removal costs; (ii) the OPA does not permit a responsible party like Savage to bring a claim for contribution against the Government for oil-spill removal costs in a comparative fault context; and (iii) Savage cannot bring its claims against the Government under the FTCA because this is an admiralty case, such that the FTCA waiver of sovereign immunity has no permissible application here. (Doc. 50.) As a matter of well-settled law, in order to bring its claims against the Government, Savage must be able to identify an applicable waiver of

sovereign immunity.[2]  Defendant's position in the Motion to Dismiss is that no such waiver exists as to plaintiff's claim for recovery of oil-spill removal costs, although there is such a waiver in effect for other aspects of plaintiff's claim.  Savage disagrees, and filed its own Motion for Partial Summary Judgment in order to obtain a definitive resolution of that narrow legal question.  Each side has now been afforded a full and fair opportunity to be heard on what appears to be an issue of first impression.  The parties have not identified a single decisional authority that is directly on point, nor has this Court's independent research located any such rulings.

**II.     Analysis.**

      *A.     Application of the SAA's Sovereign Immunity Waiver.*

           *1.     The SAA's Sovereign Immunity Waiver.*

As noted, Savage principally hangs its jurisdictional hat on the waiver of sovereign immunity contained in the Suits in Admiralty Act.[3]  The critical statutory language reads as follows:

> "In a case in which … if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty *in personam* may be brought against the United States or a federally-owned corporation."

46 U.S.C. § 30903(a).  The Supreme Court has observed generally that the SAA "contains a broad waiver of sovereign immunity." *Henderson v. United States*, 517 U.S. 654, 665, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996); *see also Gordon v. Lykes Bros. S.S. Co.*, 835 F.2d 96, 98 (5th Cir. 1988) ("In effect, the SAA is a jurisdictional statute providing for maintenance of admiralty suits against the United States which encompasses all maritime torts alleged against the United

---

    [2]     "Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, … together with a claim falling within the terms of the waiver ….  The terms of consent to be sued may not be inferred, but must be unequivocally expressed …." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (citations and internal quotation marks omitted). The parties' dispute in these dueling Motions boils down to the fundamental, threshold legal question of whether there is or is not such a waiver of sovereign immunity applicable to Savage's claims seeking recovery of oil cleanup costs from the Government.

    [3]     In the Amended Complaint, Savage affirmatively pleads that "[b]y virtue of the Suits in Admiralty Act, the United States of America and the United States Army Corps of Engineers have consented to be sued in this Honorable Court on the claim(s) hereinafter set forth." (Doc. 39, ¶ 4, PageID.164.)

States."). Everyone agrees that if the circumstances described in the Amended Complaint involved a private person or property, Savage could maintain a civil action in admiralty; therefore, the SAA would appear on its face to confer the requisite waiver to enable Savage to maintain this admiralty action against the United States.[4]

Defendant's concurrence that such a waiver of sovereign immunity exists for Savage's claims under the SAA is accompanied by a glaring caveat. According to the United States, **"[a]part from its removal cost claim**, Savage correctly identifies the SAA as waiving sovereign immunity." (Doc. 50, PageID.227 (emphasis added).) It is undisputed, then, that Savage may proceed under the SAA with all of its non-removal cost claims against the United States in this action. However, the removal cost claim is, by all appearances, the tail that wags the dog here. Information presented by the parties suggests that of the more than $4 million in damages claimed by Savage, in excess of $3 million consists of oil removal / environmental cleanup costs, with the roughly $1 million remainder attributable to categories of loss such as barge repair, lost cargo, demurrage, civil penalties and travel expenses. (Doc. 50, PageID.208; doc. 39, ¶ 21, PageID.170.) By plaintiffs' own reckoning, "Savage paid more than $3 million to clean the Lock and … restored the environment to its pre-spill condition. Now, Savage is entitled to recover its costs under the Suits in Admiralty Act from the party whose negligence caused the Accident in the first place, the United States." (Doc. 54, PageID.277-78.)

---

[4] The Court recognizes that, in addition to the above-quoted language from § 30903(a), Savage also invoked the next sentence of that provision, which reads as follows: "In a civil action in admiralty brought by the United States or a federally-owned corporation, an admiralty claim *in personam* may be filed or a setoff claimed against the United States or corporation." 46 U.S.C. § 30903(a). Plaintiffs are correct that the Government has asserted Counterclaims against Savage under the OPA for reimbursement of oil-spill cleanup costs expended by the Oil Spill Liability Trust Fund, established by 26 U.S.C. § 9509. As such, the SAA would allow an alternative basis for arguing waiver of sovereign immunity in this case, apart from the "private person or property" language. The Court does not address this avenue separately because the analysis under both prongs of § 30903(a) is exactly the same here. The parties have not argued otherwise. The same considerations and analysis that render the sovereign immunity waiver of the SAA inapplicable where an admiralty action could have been maintained if a private person or property were involved also undermine Savage's attempt to rely on the SAA's sovereign immunity waiver where the United States has brought an admiralty claim against the prospective plaintiffs. The Court will not repeat the analysis for both categories of SAA sovereign immunity waivers.

    2. *The Oil Pollution Act Framework.*

  The United States' position, however, is that the SAA waiver of sovereign immunity governing Savage's claims for recovery of other forms of damage from the accident does not reach the oil removal / environmental cleanup cost category of Savage's damages. In the United States' view, this result flows directly from the passage of the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.* (the "OPA"). Enacted in the aftermath of the *Exxon Valdez* disaster, "[t]he OPA is Congress's effort to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry." *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 344 (5th Cir. 2017) (citation and internal quotation marks omitted). To "facilitate[] prompt cleanup and compensation," the OPA requires a responsible party – which in the case of a vessel is "any person owning, operating, or demise chartering the vessel" – to be "strictly liable for cleanup costs and damages and first in line to pay any claims for removal costs or damages that may arise under OPA." *Id.* (citations omitted). Thus, when Savage paid upfront for the oil-spill cleanup costs at the Lock, it did so pursuant to its status under the OPA as a responsible party (*i.e.*, operator of the Barge) at the time of the spill.[5]

  The issue then becomes whether and under what circumstances Savage can recover the oil-spill cleanup costs it paid as a responsible party if the United States or its agent (*i.e.*, the USACOE, the lock master) was wholly or partially at fault. The Government emphasizes that the OPA repealed a provision of a predecessor statute, the Federal Water Pollution Control Act Amendments of 1972 (the "FWPCA"), that expressly allowed vessel owners/operators to recover reasonable costs of oil removal from the United States when "such discharge was caused solely by … (C) negligence on the part of the United States Government." 33 U.S.C. § 1321(i). Indeed, the OPA unequivocally provides that § 1321(i) "shall not apply with respect to any incident for which liability is established under" 33 U.S.C. § 2702, which is the strict liability

---

[5]  Although Savage owned the Vessel pushing the Barge that ruptured, as opposed to owning the Barge itself, it is still properly classified as an "operator" of the Barge for OPA liability purposes. *See United States v. Nature's Way Marine, L.L.C.*, 904 F.3d 416, 421 (5th Cir. 2018) (observing that "the ordinary and natural meaning of 'operating' a vessel under the OPA would … include the act of piloting or moving the vessel" and that "navigating a barge through a river entails a degree of discretion and judgment" falling within the statutory definition of "to operate").

provision of the OPA. Pub.L. 101-380, 104 Stat. 484 (Aug. 18, 1990). There can be no reasonable question that the OPA removed the FWCPA's defense of sole negligence on the part of the United States for responsible parties such as Savage.[6]

Notwithstanding the OPA's irrefutable alteration of pre-existing law in this manner, Savage contends that the OPA still leaves a clear path for it to pursue a negligence action against the Government for recovery of oil-spill cleanup costs, via the statute's contribution provision. That section reads as follows: "A person may bring a civil action for contribution *against any other person* who is liable or potentially liable under this Act *or another law*." 33 U.S.C. § 2709 (emphasis added). In Savage's view, since the SAA allows it to sue the Government for admiralty claims to the same extent it could sue a private party, the SAA constitutes "another law" for § 2709 purposes. So far, so good. The trickier question, however, is whether the United States is a "person" for purposes of that section. The term "person" is defined in the OPA as meaning "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 2701(27). For its part, Savage contends that the term "person" necessarily includes the United States

---

[6] To take the point one step further, it bears emphasis that all other FWCPA defenses as to the United States were carried over to the OPA, with sole negligence by the United States being the lone exclusion. In particular, the FWCPA provided that a vessel owner/operator could recover removal costs against the United States where the oil discharge "was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party …, or of any combination of the foregoing causes." 33 U.S.C. § 1321(i). By contrast, the OPA provided that § 1321(i) was inapplicable in the OPA context, but then established as complete defenses that "[a] responsible party is not liable for removal costs or damages … if … the discharge … of oil and the resulting damages or removal costs were caused solely by – (1) an act of God; (2) an act of war; (3) an act or omission of a third party …; or (4) any combination of paragraphs (1), (2), and (3)." 33 U.S.C. § 2703(a). Thus, the net effect is that the OPA eliminated a responsible party's complete defense under FWCPA for oil spill damages caused solely by the United States, while retaining and preserving all three of the other FWCPA complete defenses (act of God, act of war, third-party act or omission). Although Savage insists that § 2703 is "simply not relevant to Savage's cause of action" because it confuses defenses with causes of action (doc. 54, PageID.277), a fair reading of the OPA demonstrates that responsible parties such as Savage can indeed rely on the § 2703 "defenses" as the basis for asserting claims for removal costs and damages; therefore, plaintiffs would invoke a false distinction. *See* 33 U.S.C. § 2708(a)(1) ("The responsible party for a vessel or facility from which oil is discharged … may assert a claim for removal costs and damages … only if the responsible party demonstrates that … the responsible party is entitled to a defense to liability under section 2703 of this title ….").

because (i) it includes the term "State," and (ii) the terms "State" and "United States" are defined synonymously within the OPA.  In particular, the definitional section of the statute provides that, "'United States' and 'State' mean the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession of the United States." 33 U.S.C. § 2701(36).  Thus, in Savage's view, wherever the OPA says "State," it necessarily means "State" or "United States" because those terms are defined the same way in § 2701(36).

                3.      *The United States is Not a "Person" under the OPA.*

As the Government correctly points out, however, there are three significant obstacles with Savage's construction of § 2709 as including the United States.  First, had Congress intended every use of the term "State" to mean "State or the United States" interchangeably, it would not have recited them separately in numerous places in the OPA.  *See, e.g.,* 33 U.S.C. § 2701(29) (defining "public vessel" as "a vessel owned or bareboat chartered and operated ***by the United States, or by a State*** or political subdivision thereof") (emphasis added); 33 U.S.C. § 2702(b)(1)(A) ("removal costs" include "all removal costs incurred by ***the United States, a State***, or an Indian tribe") (emphasis added); 33 U.S.C. § 2702(b)(2)(A) ("damages" include damages for destruction of natural resources, "which shall be recoverable by ***a United States trustee, a State trustee***, an Indian tribe trustee, or a foreign trustee") (emphasis added); 33 U.S.C. § 2702(b)(2)(D) ("damages" include net loss of taxes, royalties, rents, fees, or net profits shares due to loss of property or natural resources, "which shall be recoverable by ***the Government of the United States, a State,*** or a political subdivision thereof") (emphasis added).  To adopt Savage's interpretation would run afoul of the canon of statutory construction against superfluousness.  *See, e.g., In re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) ("Because legal drafters should not include words that have no effect, courts avoid a reading that renders some words altogether redundant. … This surplusage canon obliges us, whenever possible, to disfavor an interpretation when that interpretation would render a clause, sentence, or word … superfluous, void, or insignificant.") (citations and internal quotation marks omitted).

Second, Savage's expansive reading of "person" to include "United States" where the term is defined as including only a "State" cannot be reconciled with the OPA as a whole.  Recall that under the predecessor statute, the FWCPA, vessel operators like Savage could sue to

recover oil spill remediation costs from the United States <u>only</u> where the discharge was caused solely by an act of God, an act of war, the United States' negligence, or the act or omission of a third party. The OPA deleted the defense for oil spills caused solely by the United States' negligence, while retaining the others. This feature of the OPA signals a congressional intent to make it more difficult for responsible parties to recover oil-spill cleanup costs from the United States. Yet in Savage's view, at the same time that the OPA foreclosed recovery actions against the United States for oil discharges caused solely by the United States' negligence, the OPA also created a brand-new statutory avenue of liability for responsible parties to sue the United States in contribution for oil spills as to which the United States was only partially at fault. The FWCPA contained no such mechanism, and Savage makes no showing otherwise. *See generally Reliance Ins. Co. v. United States*, 677 F.2d 844, 849 (Ct. Cl. 1982) ("only where the owner's or operator's conduct was so indirect and insubstantial as to displace him as a causative element of the discharge would he be relieved of responsibility and, correspondingly, financial liability"). It would make little sense for Congress to bar responsible parties from recovering for oil spills caused solely by the United States' negligence, but simultaneously to allow responsible parties to recover in contribution for oil spills caused partially by the United States' negligence. Simply put, Savage's attempt to impute a congressional intent to create a contribution cause of action against the United States in the OPA places far more weight on the statutory definition of "person" (which, again, did not enumerate the United States as falling within its ambit) than it can reasonably bear.[7]

---

[7] Also cutting against Savage's favored interpretation is a side-by-side comparison of the relevant definitional sections of the OPA and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). In CERCLA, Congress used a very similar construct to the OPA for defining "State" and "United States." Specifically, CERCLA provides, "The terms 'United States' and 'State' include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction." 42 U.S.C. § 9601(27). Because "State" and "United States" are defined identically in CERCLA, Savage's reasoning would suggest that CERCLA's definition of "person" need only include "State" to cover the United States, as well. In fact, however, Congress defined "person" in CERCLA as meaning "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, **United States Government, State**, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21) (emphasis added). Because Congress in (Continued)

Third, the case law recognizes a well-settled presumption that the term "person" in a statute does not include the sovereign in common usage, absent an affirmative showing of congressional intent to the contrary. *See, e.g., Return Mail, Inc. v. United States Postal Service*, 139 S.Ct. 1853, 1861-62, 204 L.Ed.2d 179 (2019) (relying on "longstanding interpretive presumption that 'person' does not include the sovereign, and thus excludes a federal agency like the Postal Service. … [A]lthough the presumption is not a hard and fast rule of exclusion, … it may be disregarded only upon some affirmative showing of statutory intent to the contrary ….") (citations and internal quotation marks omitted); *International Primate Protection League v. Administrators of Tulane Educational Fund*, 500 U.S. 72, 82-83, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) ("As we have often noted, in common usage, the term person does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it.") (citations and internal marks omitted). That said, the Supreme Court recognizes that "there is no hard and fast rule of exclusion of the sovereign," and that the presumption may be overcome if "the purpose, the subject matter, the context, the legislative history, or the executive interpretation of the statute … indicate an intent, by the use of the term, to bring state or nation within the scope of the law." *International Primate*, 500 U.S. at 83 (citations and internal marks omitted). In the undersigned's view, Savage has not made a sufficient showing to overcome the presumption that the term "person" as used in the OPA excludes the sovereign. Indeed, Savage relies exclusively on a strained reading of the definitions of "State" and "United States" as being identical, when that construction is at odds with Congress's use of the two terms throughout the statute and is not backed by context, legislative history or executive interpretation.

For all of these reasons, the Court concludes that the United States is not a "person" within the parameters of the OPA's contribution provision found at 33 U.S.C. § 2709. As such, Savage's reliance on § 2709 as a jurisdictional hook that enables it to seek recovery of oil-spill cleanup costs from the United States in this action is misplaced, as a matter of law.

---

CERCLA explicitly defined "person" as including both "State" and "United States," despite having defined the terms "State" and "United States" together, Savage's theory – that the mention of "State" as a "person" for OPA purposes is sufficient to encompass "United States" despite the omission of "United States" from that definition because "State" and "United States" are defined together elsewhere in the OPA – is logically infirm and appears irreconcilable with congressional intent.

### 4. *The Purported Conflict Between the OPA and the SAA.*

Savage balks at this result, arguing that interpreting § 2709 in a manner that excludes the United States creates a conflict between the OPA and SAA that could be readily avoided simply by deeming the United States a "person" for purposes of § 2709. Of course, plaintiffs are correct that "[t]he conclusion that two statutes conflict … is one that courts must not reach lightly. If any interpretation permits both statutes to stand, the court must adopt that interpretation, absent a clearly expressed congressional intention to the contrary." *Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1299 (11th Cir. 2010) (citation omitted). Plaintiffs are also correct that there is a discrepancy between the SAA's waiver provision at 46 U.S.C. § 30903(a) allowing a civil action in admiralty to be brought against the United States in any case where it could be brought against a private person, on the one hand, and the OPA's exclusion of the United States from the list of "persons" against whom a contribution action for oil-spill remediation costs can be brought under 33 U.S.C. § 2709.

To recognize that the two statutes conflict in this manner, however, is not necessarily to conclude that Savage's construction of § 2709 must prevail as a means of eliminating the conflict. After all, "Congress's intent to effect an implied repeal can be inferred when a later statute conflicts with or is repugnant to an earlier statute; or when a newer statute covers the whole subject of the earlier one, and clearly is intended as a substitute." *Miccosukee*, 619 F.3d at 1299. Those are just the sort of circumstances found here. The Suits in Admiralty Act dates back more than a century, having been enacted in 1920, and includes a general pronouncement that a civil action in admiralty may be brought against the United States in any case where it could have been maintained had a private person or property been involved. By contrast, the Oil Pollution Act is much more recent, having been enacted in 1990, and is narrowly aimed at enforcing removal of oil spills and assigning liability for cleanup costs. "The text of OPA implies its mandatory and exclusive nature." *Settoon*, 859 F.3d at 345 n.4 (citation omitted). For a detailed remedial scheme such as the OPA, "only ***its own text*** can determine whether the damages liability Congress crafted extends to the Federal Government." *United States v. Bormes*, 568 U.S. 6, 15, 133 S.Ct. 12, 184 L.Ed.2d 317 (2012) (emphasis in original). In this circumstance, the Supreme Court has counseled, plaintiffs may not "remedy the absence of a waiver of sovereign immunity in specific, detailed statutes [such as the OPA] by pleading general … jurisdiction [under a statute like SAA]." *Id.*

Of course, that is precisely what Savage is attempting to do here. Congress has enacted a specific, detailed statute assigning responsibility for oil-spill cleanup costs (at the initial payee level, and beyond)[8] that lacks any waiver of sovereign immunity applicable to the events pleaded in the Amended Complaint. In so doing, Congress has expressed its intent to effect an implied repeal of the general sovereign immunity provision in the SAA as it pertains to oil-spill cleanup damages. That expression of congressional intent obviates Savage's concern of a statutory conflict. Moreover, per *Bormes*, Savage is not permitted to look beyond the OPA to engraft a sovereign immunity waiver from a more general statute (in this case, the SAA) onto a more specific statute (here, the OPA), thereby supplying one that OPA's detailed remedial scheme does not. This is the sort of "mixing-and-matching" problem with Savage's position that the Government identifies in its briefing.

For all of these reasons, the Court does not credit Savage's argument that construing § 2709 of the OPA not to allow contribution actions against the United States because the United States is not a statutory "person" creates impermissible conflicts between the SAA and the OPA that must be avoided, as a matter of law.[9]

---

[8] This is an important point. Savage repeatedly beats the drum that the OPA only has to do with assigning responsibility for who is first in line to pay oil spill cleanup costs, such that the OPA should not be read as having anything to say about the types of recovery actions available to an admittedly responsible party such as Savage. The trouble, of course, is that the OPA on its face actually has quite a bit to say – most notably in §§ 2708, 2709, 2713 and 2717 – about the legal avenues available to a responsible party who is, or would otherwise be, the "first in line" payee of oil-spill remediation costs.

[9] Three additional points merit brief discussion at this time. First, Savage's suggestion that there is an interpretation of § 2709 that will allow both the SAA and the OPA to stand is incorrect. For the reasons stated in § II.A.3., *supra*, the Court is of the opinion that the OPA cannot logically be read to define the United States as a "person" for purposes of the contribution provision. Nothing in *Miccusokee* or any other legal authority would require a court to adopt an illogical or nonsensical interpretation of a statute in order to avoid a conflict. Second, given the existence of a statutory conflict, applicable rules of construction require the Court to give precedence to the OPA over the SAA. After all, "[t]he Eleventh Circuit has held that when two statutes conflict, the later-enacted statute controls to the extent it conflicts with the earlier-enacted statute. … Moreover, a specific statutory provision trumps a general one." *Miccosukee*, 619 F.3d at 1299 (citations omitted). The OPA is both the later-enacted and the more specific statutory provision at issue. Third, although Savage objects that the United States is trying to delete, eradicate and otherwise read out of existence the SAA's waiver of sovereign immunity (*see* doc. 54, PageID.272-73), this concern is overblown. Congress carved out a (Continued)

        5.      *Application of the OPA's Savings Provision.*

Next, Savage maintains that it would be error to limit plaintiff's oil-spill recovery remedies to those provided by the OPA, while excluding the SAA's remedies, because the OPA contains a savings provision. In particular, plaintiffs rely on statutory language in the OPA providing as follows: "Except as otherwise provided in this Act, this Act does not affect – (1) admiralty and maritime law; or (2) the jurisdiction of the district courts of the United States with respect to civil actions under admiralty and maritime jurisdiction …." 33 U.S.C. § 2751(e). According to plaintiffs, because admiralty law (and particularly the SAA) allows Savage to pursue negligence claims for damages against the United States, that remedy is preserved for them under the OPA through application of § 2751(e).

The defect with Savage's reliance on the savings provision is that it overlooks the "[e]xcept as otherwise provided in this Act" language. As described *supra*, the OPA changed the law by eliminating the FWPCA defense for recovery of cleanup costs for an oil spill caused solely by the United States' negligence. It also defined a "person" against whom an action for contribution may be brought under the OPA in a manner that excludes the United States. Simply put, the OPA savings provision cannot save Savage's attempt to obtain oil-spill recovery damages from the United States, as Savage might be permitted to do under the general provisions of the SAA, because the Act (*i.e.*, the OPA) in fact "provides otherwise." As such, the savings provision of the OPA furnishes no sanctuary to Savage. *See, e.g., United States v. American Commercial Lines, L.L.C.*, 759 F.3d 420, 426 (5th Cir. 2014) ("The savings clause here begins with 'except as otherwise provided.' … [C]ourts cannot, without any textual warrant, expand the operation of savings clauses to modify the scope of displacement under OPA.") (citations and footnote omitted).

The Government correctly points out that Savage's attempt to construe the OPA as preserving Savage's claims against the United States under the SAA for recovery of oil-spill cleanup costs is an "unprecedented reading." (Doc. 57, PageID.308.) Indeed, Savage does not

---

separate set of rules in the oil-spill context, thereby trumping the generally applicable rule with a more specific provision in that limited instance. There is nothing improper about it, and SAA's general sovereign-immunity waiver remains in full force and effect for the entire panoply of other admiralty claims. Nothing has been or is being "stricken from every book and tablet," as Savage puts it.

identify – and the Court's research has not unearthed – a single post-OPA decision allowing a responsible party to recover oil-spill cleanup costs from the United States in circumstances analogous to those described here.  To be sure, Savage touts *Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131 (1st Cir. 2017), in support of the proposition that "courts have upheld the validity of SAA claims against the Government in the post-OPA world." (Doc. 54, PageID.276.)  This characterization is technically accurate; after all, the *Ironshore* court applied the OPA savings provision at § 2751(e) to reverse the lower court's *sua sponte* dismissal of the plaintiff's negligence claims against the United States relating to an oil spill.  Nonetheless, Savage's reliance on that holding is undermined by a key, material distinction between *Ironshore* and this case.  Specifically, *Ironshore* concerned a military vessel owned and operated by the United States, which the First Circuit expressly found "qualifies as a public vessel under the OPA." 871 F.3d at 139.  Why does that matter?  Because the OPA states, "This subchapter does not apply to any discharge … from a public vessel." 33 U.S.C. § 2702(c)(2).  By declaring the *Ironshore* vessel to be a "public vessel," then, the First Circuit necessarily found that the OPA did not apply to that oil spill.  The OPA regulatory scheme had no application to the underlying incident; as such, the "except as otherwise provided" language in the § 2751(e) savings provision of the OPA presented no impediment to applying "any preexisting admiralty and maritime law that applied to public vessels before the OPA's passage." 871 F.3d at 139.  By contrast, this case does not involve a public vessel.  Nothing about the circumstances of Savage's oil-spill cost recovery claim against the United States would remove it from the purview of the OPA.  Therefore, the "except as otherwise provided" limitation to the § 2751(e) savings provision negates that provision's availability to Savage, even though it did not do so for the claimant in *Ironshore*.  Simply put, *Ironshore* lends no support to Savage's argument, and Savage identifies no decisions from the three-plus decades following OPA's enactment that have construed the OPA and the SAA together in the manner for which it advocates here.[10]

---

[10]   In its summary judgment reply brief, Savage cites *Maritrans Operating Partners, LP v. Port of Pascagoula*, 73 Fed.Appx. 733 (5th Cir. 2003), for the proposition that a barge owner successfully sued the United States under both the SAA and the OPA after its barge ran aground. (Doc. 62, PageID.422.)  However, this very short *per curiam* opinion says nothing about whether the plaintiff was successful in its OPA claims, who paid for oil-spill removal, or how the SAA and OPA interact as to waivers of sovereign immunity; rather, the opinion is focused on narrow issues concerning recovery of lost profits and prejudgment interest, neither of (Continued)

### 6. Savage's Objection to "Absurd Results."

Finally, plaintiffs object that construing the OPA in a manner that would foreclose Savage's ability to seek contribution of oil-spill removal damages from the Government "leads to absurd and inequitable results." (Doc. 54, PageID.278.) In so arguing, Savage posits that even if it proves the subject accident was 100% the fault of the Government (and its agent, the USACOE lock master), Savage will be "left footing the bill for an Accident it had no hand in causing." (*Id.*) It reasons that the Government's interpretation means that parties in Savage's position must "play Russian roulette *vis-à-vis* the competence of lock operators because they will never have recourse for lock operator negligence." (*Id.*, PageID.279.) And Savage protests that this result is unfair because it is expressly conditioned on the barge's cargo being oil, whereas "Savage could recoup 100% of its damages from the United States if [Savage] was pushing grain, steel ingots or solid nuclear waste." (*Id.*)

The Government's persuasive rejoinder to this line of reasoning is that Congress made a legislative choice in the OPA to treat oil spills differently than other types of cargo accidents, at least as to recovery of remediation costs. Although plaintiffs balk that the Government is trying to establish that Congress "covertly" created this carve-out for oil spill liability and "silently" overruled the SAA, the Court cannot agree that the congressional action here was cloaked in shadows. As discussed *supra*, in enacting the OPA Congress left two very clear markers of its intention to repeal implicitly the SAA sovereign-immunity waiver for oil-spill remediation claims in circumstances like those pleaded here. First, the OPA eliminated a responsible party's complete defense to liability under the predecessor statute, the FWCPA, where an oil spill was caused solely by the negligence by the United States. Second, the OPA excluded the United States from the definition of a "person" against whom a responsible party is authorized to pursue an action in contribution. Viewed in context, the OPA reflects a legislative determination that oil cleanup costs are to be treated differently than cleanup costs for maritime accidents involving other types of cargo like grain or steel ingots. Of course, it is not the province of this Court to second-guess, much less supplant, that legislative choice with its own policy preferences. *See, e.g., SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S.Ct. 954, 967,

---

which shed any light on the jurisdictional questions at issue here. As such, *Maritrans* lends no perceptible support to Savage's position.

197 L.Ed.2d 292 (2017) ("we cannot overrule Congress's judgment based on our own policy views"); *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1300-01 (11th Cir. 2010) ("Courts may not rewrite the language of a statute in the guise of interpreting it in order to further what they deem to be a better policy than the one Congress wrote into the statute.").[11]

### B. Application of the FTCA's Sovereign Immunity Waiver.

Separate and apart from Savage's oil-spill remediation claims brought pursuant to the Suits in Admiralty Act, the Government also moves for dismissal of Savage's claims brought under the Federal Tort Claims Act (the "FTCA"). Recall that in its Amended Complaint, Savage designated two jurisdictional footholds, namely, (i) the admiralty and maritime jurisdiction of the United States via the SAA's sovereign immunity waiver, and (ii) the FTCA's sovereign immunity waiver. On the latter point, Savage's pleading states as follows: "Alternatively and/or additionally, this action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346. Per that statute, the United States waives sovereign immunity for the torts of government employees, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." (Doc. 39, ¶ 5 (citation and internal quotation marks omitted).)

The Government's argument for dismissal of the FTCA claims is, quite simply, that "[t]his is an admiralty case, and the [FTCA] does not apply." (Doc. 50, PageID.228.) As statutory support for its position, the Government cites a provision specifying that the FTCA "shall not apply to … any claim for which a remedy is provided by chapter 309 [the SAA] or 311 [the Public Vessels Act] of title 46 relating to claims or suits in admiralty against the United States." 28 U.S.C. § 2680(d). Courts have recognized the mutually exclusive nature of the SAA

---

[11] Savage also argues that construing the OPA and the SAA together in a manner that would allow Savage to recoup from the Government its damages for all expenditures other than oil cleanup costs would be unworkable because it would force "this Court to undertake a review of the excruciating minutiae of Savage's roughly $4 million in damages to determine the subjective intent behind each dollar spent ('oil cleanup' vs. 'anything else') …." (Doc. 54, PageID.281-82.) This argument is not persuasive because, first, courts engage in such sorting, parsing and categorizing of itemized damages all the time and, second, Savage itself has apparently already performed such an exercise of its damages down to the last dollar. (Doc. 50, PageID.208 ("According to Savage, its damages are these: $3,082,531 (oil removal), $501,886 (barge repair), $138,430 (lost cargo), demurrage ($467,400), civil penalties ($34,000), and travel expenses ($14,649). Savage Answer to U.S. Interr. No. 14.")).

and the FTCA.  *See, e.g., Miller v. United States*, 725 F.2d 1311, 1313 (11th Cir. 1984) ("an action brought under the DOHSA, a part of the SAA, cannot be maintained under FTCA because ***jurisdiction under the FTCA and SAA are mutually exclusive***") (emphasis added); *Anderson v. United States*, 245 F. Supp.2d 1217, 1226 (M.D. Fla. 2002) ("Finding that this is a case arising in admiralty, this lawsuit may not be brought under the FTCA and may be maintained appropriately only as an admiralty case under the PVA or the SAA.").  In the unambiguous words of the Eleventh Circuit, "if admiralty jurisdiction exists for [Savage]'s claim, it cannot be brought under the FTCA."  *Anderson v. United States*, 317 F.3d 1235, 1237 (11th Cir. 2003).

In response, Savage asserts that the Government's request for dismissal of the FTCA claims is premature.  Plaintiff theorizes that discovery might unearth evidence of shore-based negligence by the United States that was a causal factor in the accident, such as negligent hiring / training / supervision by the lock master's superiors.  In that event, Savage reasons, it would have claims for land-based negligence sounding in the FTCA, rather than admiralty law.  However, plaintiff does not identify a single case authority that has recognized viable FTCA claims for shore-based negligence contributing to an accident occurring in navigable waters of the United States.  There is ample precedent to the contrary.  *See, e.g., Uralde v. United States*, 614 F.3d 1282, 1286-88 (11th Cir. 2010) (finding that the SAA governed plaintiff's claims for negligence by Coast Guard personnel stationed on land in making decisions for a vessel passenger's treatment and transportation); *Taghadomi v. United States*, 401 F.3d 1080, 1090 & n.11 (9th Cir. 2005) (where plaintiffs alleged negligence by shore-based Coast Guard Operations Center officials in failing to contact local authorities to assist in a search and rescue effort, holding that plaintiffs "may not bring the negligence claim under the FTCA" because the PVA or SAA supplied a remedy).

Plaintiff's argument is unpersuasive for a more general reason, as well.  Savage appears to be contending that negligent activity on land causing an injury in navigable water necessarily removes the claim from the purview of admiralty jurisdiction.  The law is otherwise.  *See, e.g., Taghadomi*, 401 F.3d at 1084 ("the situs of a tort for the purpose of determining admiralty jurisdiction is the place where the injury occurs …, even when some of the negligent activity occurs on land"); *Miller*, 725 F.2d at 1315 (finding that "the correct jurisdiction is within the SAA, rather than the FTCA," where plaintiffs sued Government for negligence by land-based air traffic controller resulting in airplane crash in international waters); *Moyer v. Rederi*, 645 F.

Supp. 620, 627-28 (S.D. Fla. 1986) (rejecting argument that defendant's land-based acts of negligence causing injury on the high seas "rendered admiralty jurisdiction inappropriate"). Plaintiff here provides no support for its stated position that any claims it may raise that land-based negligence by the United States caused the accident in the Jamie Whitten Lock in the Tennessee-Tombigbee Waterway would be properly analyzed under the FTCA, rather than admiralty jurisdiction.

### III. Conclusion.

For all of the foregoing reasons, it is **ORDERED** as follows:

1. Plaintiffs' Motion for Partial Summary Judgment (doc. 55) is **DENIED**;
2. The Government's Partial Motion to Dismiss (doc. 49) is **GRANTED**;
3. Plaintiffs' claims for recovery of oil-spill removal costs are **DISMISSED**;
4. Plaintiffs' claims under the Federal Tort Claims Act are **DISMISSED**; and
5. This action will proceed as plaintiffs' remaining claims under the Suits in Admiralty Act.

DONE and ORDERED this 25th day of February, 2021.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE