IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SAVAGE SERVICES CORPORATION, et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) CIVIL ACTION 20-0137-WS-N ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) |

## ORDER

This matter is before the Court on the plaintiffs' motion for summary judgment. (Doc. 116).[1] The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 117, 131, 138), and the motion is ripe for resolution. After careful consideration, the Court conclude the motion is due to be denied.

## BACKGROUND

According to the amended complaint, (Doc. 39), the plaintiffs owned and operated an inland towing vessel ("the Vessel"). On September 8, 2019, the Vessel was pushing two tank barges downstream on the Tennessee-Tombigbee Waterway ("Tenn-Tom"). The Vessel maneuvered the barges into the Jamie Whitten Lock ("the Lock"). The United States Army Corps of Engineers ("the Corps") was responsible for the operation of the Lock. During the de-watering process, the rake end of one barge ("the Barge") got caught on the upstream miter

---

[1] The plaintiffs' motion is more accurately described as one for partial summary judgment, as it seeks a ruling as to liability but not as to damages. The Court nevertheless employs the plaintiffs' chosen nomenclature.

sill. As the water level in the lock chamber continued to fall, the rake end of the Barge rose out of the water. Eventually, the rake end bent, the Barge fell off the miter sill, and the distorted rake punctured a cargo tank of the Barge, resulting in a release of crude oil. (*Id*. at 2-5). The plaintiffs, invoking the Suits in Admiralty Act ("SAA") and the Federal Tort Claims Act ("FTCA"), accuse the defendant of negligence and seek to recover over $4 million, chiefly in the form of environmental cleanup costs but also including: fines and penalties; damage to the Barge; loss of the Barge's cargo; loss of use of the Barge and the Vessel; and potential claims by third parties. (*Id*. at 2, 8).

The defendant's answer to the amended complaint includes a counterclaim under the Oil Pollution Act of 1990 ("OPA"), pursuant to which the defendant seeks reimbursement of its oil spill removal costs. (Doc. 44 at 6-11).

The defendant moved to dismiss the plaintiffs' amended complaint to the extent it seeks recovery of oil spill removal costs, on the grounds that OPA eliminates any right to recover such costs. The defendant also sought dismissal of all of the plaintiffs' claims to the extent grounded on the FTCA. (Doc. 49). The plaintiffs in turn moved for a ruling that the defendant had waived its sovereign immunity. (Doc. 55). In a published opinion, the Court granted the defendant's motion and denied the plaintiffs' motion. *Savage Services Corporation v. United States*, 522 F. Supp. 3d 1114 (S.D. Ala. 2021). On interlocutory review, the Eleventh Circuit affirmed, *Savage Services Corp. v. United States*, 25 F.4th 925 (11th Cir. 2022), and it has now denied the plaintiffs' application for rehearing *en banc*. (Doc. 161).

The plaintiffs' instant motion seeks a ruling "that the negligence of defendant United States of America was the sole cause of the accident at the center of this lawsuit." (Doc. 116 at 1). The defendant acknowledges that the plaintiffs may pursue their claim for damages (other than oil spill recovery costs) under the SAA. (Doc. 49 at 1). The defendant denies, however, both that it was negligent and that the plaintiffs were not.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; accord *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); accord *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; accord *Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a

genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  "Therefore, the [non-movant's] version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the [movants] and not in tension with the [non-movant's] version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).

The parties agree to the statements in this paragraph.  The Lock has a miter sill at the upstream end of the lock chamber, running perpendicular to the length of the chamber, which is underwater when the Lock is full but which becomes exposed as water is released.  There is another miter sill at the downstream end of the lock chamber.  The distance between the miter sills is 600 feet.  The location of each miter sill is denoted by a yellow painted line rising vertically along the chamber wall.  The two-barge tow was configured end to end, with the Vessel pushing from behind.  The barges had a combined length of 595 feet.  The crew tied the barges off to the lock chamber, and the Vessel's pilot, Chip Ellis, brought the Vessel alongside the barges.  The lock operator, Bobby Pharr, began the dewatering process.  The stern of the Barge was downstream of the miter sill when this process began.  At some point during the process, however, the Barge got caught on the miter sill.

According to the plaintiffs, Pharr testified that tows in the Lock "always" move upstream and/or downstream during a locking and that 1-2 feet of such movement in the Lock (sometimes called "surge") is "normal." (Doc. 117 at 1, 5, 13, 20; Doc. 117-2 at 6, 33; Doc. 138 at 2, 9, 10). According to the plaintiffs, Pharr testified that the Barge moved upstream no more than 6-8 inches, which would necessarily mean that the stern of the Barge was moored less than 6-8 inches downstream of the miter sill (else it could not have gotten caught on the miter sill). (Doc. 117 at 1, 7, 9; Doc. 117-2 at 33-34). According to the plaintiffs, Pharr should have told Ellis and the crew to expect surge of 1-2 feet and should have directed them to moor so that the Barge's stern was at least two feet downstream of the miter sill in order to account for this surge. (*Id*. at 13, 14-15; Doc. 138 at 4, 9). It is uncontroverted that Pharr did not advise Ellis or the crew to expect surge of 1-2 feet and did not direct them to moor the Barge farther downstream. (Doc. 117-1 at 19; Doc. 117-2 at 18, 20, 23). The plaintiffs argue that Pharr's failure to provide the pilot and crew this information and instruction violated duties imposed by federal statute, Corps rules and regulations, and best practices, and that his failure thus constituted negligence. (Doc. 117 at 2, 3, 5, 6, 7, 8, 9, 10-12, 13, 15; Doc. 138 at 3-4, 9).[2]

The Court assumes without deciding that Pharr's failure to tell the pilot and crew of the normal surge and to instruct them to moor the Vessel farther downstream from the miter sill could be found by a properly functioning jury to be

---

[2] The plaintiffs suggest that Pharr also had a duty to ensure that the tow was "securely" positioned in "that the lines [we]re tight." (Doc. 117 at 1, 11). Because the plaintiffs insist that "there is no evidence that any of Savage's lines were anything but perfectly tied," (Doc. 138 at 8), they cannot show that any failure by Pharr to inspect the lines was causally related to the accident.

The plaintiffs argue further that the defendant was negligent in failing to train Pharr, which "led to his negligence on the night of the accident." (Doc. 117 at 15). On its face, this argument seeks simply to hold the defendant directly liable for its own negligence in fostering Pharr's negligence, for which the defendant would be vicariously liable in any event.

5

negligent. What the plaintiffs seek, however, is a ruling that the defendant's negligence "was the sole cause of the accident." (Doc. 116 at 1). To receive such a ruling, the plaintiffs must establish either that they were not negligent or that their negligence did not causally contribute to the accident. To accomplish that on motion for summary judgment, the plaintiffs must either negate their own negligence (or any causal connection between their negligence and the accident) with affirmative evidence or point to the record to demonstrate that the defendant is incapable of producing evidence of negligence and/or causation at trial. As addressed below, the plaintiffs have done neither.

The universe of ways in which a party may be negligent is vast. The plaintiffs have not negated their own negligence, because they have failed even to identify all the myriad ways in which they might have performed negligently, much less effectively addressed each of these ways and shown by evidence and law that no properly functioning jury could find the plaintiffs negligent with respect to any of them. Nor have the plaintiffs pointed to materials on file reflecting that the defendant cannot produce at trial evidence with which to establish the plaintiffs' negligence in any respect, because they failed to procure from the defendant an exhaustive listing of asserted negligence beyond which the defendant may not venture.[3]

A single example will suffice. According to the plaintiffs, there is always surge in the Lock, and the "normal" amount of surge in the Lock is 1-2 feet in either direction. Pharr's awareness of these alleged facts, and of the Barge's

---

[3] The plaintiffs effectively concede as much. In their opening brief, they argue that the defendant has "[t]o date" advanced only one theory of the plaintiffs' negligence, (Doc. 117 at 18), reflecting their awareness that the defendant was free to advance other theories in the future. The defendant did so in its brief in opposition, (Doc. 131), but without any accompanying language by which it forswore asserting additional theories in the final pretrial document or at trial; on the contrary, the defendant stated it was addressing only "the most glaring" arguments, (Doc. 131 at 2), not all of them. By failing to propound interrogatories or other discovery designed to confine the defendant to specific theories of negligence, the plaintiffs left the defendant free to continue to identify new theories, including post-motion for summary judgment.

position only a few inches downstream of the miter sill, is the primary basis for the plaintiffs' claim that Pharr performed negligently by failing to require Ellis to move his tow farther downstream.  However, Ellis testified he had transited the Lock as pilot at least 250 times before September 8, 2019, and probably "many more times than that," with half these trips involving a southbound de-watering. (Doc. 131-3 at 10-11).  Given his extensive experience with the Lock, a properly functioning jury could find that Ellis was as aware of a "normal" 1-2 foot surge as was Pharr.  Ellis also testified that, from the Vessel's wheelhouse, he could see both the yellow line and the Barge's position relative to it.  (Doc. 117-1 at 15).  A properly functioning jury could find from this evidence that Ellis was aware that the stern of the Barge was less than 6-8 inches downstream of the miter sill when de-watering began (as the plaintiffs insist its position was).  Ellis further testified that, upon observing the yellow line and the Barge, he concluded that "[w]e were where we were supposed to be" and thereupon notified Pharr that "we were ready for locking."  (*Id*. at 15-16).  A properly functioning jury could find from this evidence that Ellis authorized de-watering to begin while knowing he could expect 1-2 feet of surge upstream and while also knowing his tow was not two feet downstream of the miter sill but only a few inches downstream.[4]

       To establish the plaintiffs' negligence, the defendant would have to show that Ellis had a duty of reasonable care, that he breached that duty, and that his breach caused or contributed to the damage for which the plaintiffs seek recovery. The Court considers these elements in turn.

       As to duty, in addressing a different theory of negligence (responsibility for ensuring the tow was properly secured with tight lines), the plaintiffs rely on testimony from two experts to support the rather startling proposition that only the lock operator – to the exclusion of the crew members who set the lines and the pilot who supervises them – has any "duty to ensure that lines are properly

---

[4] All of the evidence addressed in this paragraph was cited by the parties in their briefs.  (Doc. 117 at 6; Doc. 131 at 9; Doc. 131-1 at 1-2, 6).

secured." (Doc. 117 at 18-19). The experts, however, said no such thing. The first said only that the lock operator, once the pilot informs him the tow is secure, is to "make sure" that the pilot is correct. (Doc. 117-3 at 2-3). The other said the lock operator "is totally responsible for the way the lines are tied off," but the context makes clear he was saying only that the lock operator has the final say as to whether the lines are adequate, not that the pilot and crew have no responsibility to provide tight lines unless and until instructed to do so by the lock operator. (Doc. 117-4 at 3). Indeed, the second expert insisted that the crew "has an independent duty to tie it up correctly." (*Id*. at 4). Even were the experts' testimony as the plaintiffs describe it, the plaintiffs do not direct the Court to any legal authority – or even any legal theory – under which a lock operator's duty to inspect the crew's work could preclude the crew from having a duty to perform its work competently. The plaintiffs have not argued that only Pharr – to the exclusion of Ellis – had a duty regarding the proper placement of the tow, but any such argument would seem to be as flimsy as that addressed above.

If, as seems probable under the evidence cited above, Ellis had a duty of reasonable care to properly position the tow to avoid its becoming caught on the miter sill in the event of a normal 1-2 foot surge,[5] and if, as seems probable, that

---

[5] According to the plaintiffs, "[b]ecause Pharr knew that one to two feet of vessel movement is 'normal' in the Jamie Whitten Lock and that such surging 'always' happens, Pharr had a duty to account for that." (Doc. 138 at 9). Because a properly functioning jury could find that Ellis had the same knowledge as Pharr, by the plaintiffs' reasoning Ellis owed the same duty as Pharr.

The plaintiffs assert that the Lock had "unique features" (an unusually fast drop rate and straight rather than curved miter sills) that were known to Pharr but "[u]nknown to the crew." (Doc. 117 at 15). A properly functioning jury, however, could find that Ellis, from his 125+ southbound trips through the Lock, had observed these features and thus knew of them as well as Pharr did. As to the speed of de-watering, Ellis testified that he could not say the speed on September 8, 2019 was any faster than that on any of his other 125+ passages, (Doc. 117-1 at 13), so he clearly was aware of the Lock's unusual speed of emptying compared to other locks. As for the shape of the miter sills, they are necessarily exposed as the lock chamber is emptied, and thus their shape is readily observable.

duty existed regardless of any duty resting on Pharr to ensure the tow was properly positioned, a properly functioning jury could find that Ellis breached that duty by positioning the tow within a few inches of the miter sill even though he could have avoided all danger simply by moving the tow two feet downstream.  Ellis's failure to do so plainly was a cause of the damage to the Barge and the plaintiffs' interests for which they seek relief.

## CONCLUSION

Because the plaintiffs have neither negated their negligence in all possible respects (including without limitation that discussed above) nor demonstrated from the record that the defendants are foreclosed from raising any theory of negligence beyond those addressed by the plaintiffs, they have failed to meet their initial burden on motion for summary judgment.  For the reasons set forth above,[6] the plaintiffs' motion for summary judgment establishing that the sole cause of the accident was negligence by the defendant is **denied**.

DONE and ORDERED this 6th day of September, 2022.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[6] Because it is unnecessary to its decision, the Court does not address the defendant's discretionary-function argument.  (Doc. 131 at 13-14).  Similarly, because it cannot affect the proper resolution of the plaintiffs' motion for summary judgment, the Court has not considered any of the evidence made the subject of the parties' pending evidentiary motions.  (Docs. 121, 123, 128, 132).