**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **SAVAGE SERVICES CORPORATION,** ) | |
| *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIV. ACT. NO.  1:20-cv-137-TFM-N** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

This matter came before the Court for a non-jury trial that commenced on February 6, 2023, and concluded on February 10, 2023, with the Court's verdict in favor of the United States. Pursuant to Fed. R. Civ. P. 52(a)(1) the Court issues this opinion with its findings of fact and conclusions of law.[1, 2]

## I.    NATURE OF THE CASE

This action was brought by Savage Services Corporation and Savage Inland Marine, LLC (collectively, "Savage") against the United States.  It arises from a September 8, 2019 mishap in the chamber of the U.S. Army Corps of Engineers' Jamie Whitten Lock and Dam on the Tennessee-Tombigbee Waterway, which resulted in damage to a tanker barge and caused an oil spill.  This Court previously summarized the facts leading up to the incident:

> The Lock has a miter sill at the upstream end of the lock chamber, running perpendicular to the length of the chamber, which is underwater when the Lock is

---

[1] "'[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.'" *Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990) (quoting FED. R. CIV. P. 52 advisory committee's note to 1946 amendment).

[2] This case was originally assigned to District Judge William H. Steele and was reassigned to the undersigned on December 6, 2022.  *See* Doc. 182.

full, but which becomes exposed as water is released. There is another miter sill at the downstream end of the lock chamber. The distance between the miter sills is 600 feet. The location of each miter sill is denoted by a yellow painted line rising vertically along the chamber wall. The two-barge tow was configured end to end, with the Vessel pushing from behind. The barges had a combined length of 595 feet. The crew tied the barges off to the lock chamber, and the Vessel's pilot, Chip Ellis, brought the Vessel alongside the barges. The lock operator, Bobby Pharr, began the de-watering process. The stern of the Barge was downstream of the miter sill when this process began. At some point during the process, however, the Barge got caught on the miter sill.

*Savage Servs. Corp. v. United States*, Civ. Act. No. 20-cv-0137-WS-N, --- F.Supp.3d ----, 2022

U.S. Dist. LEXIS 160030, 2022 WL 4086551, at *2 (S.D. Ala. Sept. 6, 2022) [hereinafter *Savage I*).[3]

As Savage explains, a cargo tank opened, releasing crude oil into the chamber:

As the water in the chamber fell, the rake end of PBL 3422 rose out of the water until the angle became so steep that the barge fell off the north miter wall. The weight of the barge caused the rake end of the barge to bend upward, as reflected in the following photograph:

---

[3] Given the extensive case history and numerous underlying opinions in this matter, the Court will refer to the underlying opinions as *Savage I*, *Savage II*, *Savage III*, and *Savage IV*. The opinions will be numbered in the order they are presented in this opinion.



*Figure 1 (Barge PBL 3422 after the accident)*

*Id*. ¶ 12.

Savage alleges that the damage to the barge and the resulting oil spill were caused "solely and completely by the fault, neglect and lack of due care" on the part of the U.S. Army Corps of Engineers.  Doc. 39 at 7, PageID.169.  The United States denies liability.  *See generally* Doc. 44, PageID.177-81.  The United States filed a counterclaim, alleging that Savage is strictly liable to reimburse the Oil Spill Liability Trust Fund for U.S. Coast Guard costs incurred in overseeing the spill clean-up.  Doc. 44 at 6-11, PageID.182-87.

## II.   PROCEDURAL HISTORY

The Court, without a jury, tried this matter from February 6 to 10, 2023.  Before turning to Findings of Fact and Conclusions of Law, the Court will summarize the extensive procedural

history of this case, which sets the stage.

**A.     Complaint and United States' Motion to Dismiss Savage's FTCA Claims**

Savage brings claims against the United States for damages under the auspices of the Suits in Admiralty Act, 46 U.S.C. §§ 30901-18 ("SAA"), and the Federal Tort Claims Act, 28 U.S.C. § 1346, *et seq*. ("FTCA").  Doc. 39 at 2.

Savage seeks damages for environmental-cleanup costs ($3,082,531), fines and penalties imposed by federal and state authorities ($34,000), damage to the PBL 3422 ($501,886), loss of cargo from barge PBL 3422 ($138,430), and loss of use of the M/V Savage Voyager and PBL 3422 ($467,400).  *Id*. at 3, 8.  In sum, Savage claims to have suffered damages in excess of $4.2 million, approximately $3.1 million of which are associated with environmental cleanup.  *Id*. ¶ 21 (listing damages).  The government moved the Court to dismiss Savage's FTCA claims on the grounds that the SAA and FTCA are mutually exclusive.  *See* Doc. 49, PageID.204-06; Doc. 50, PageID.207-30.  The government argued that if the SAA applies, the FTCA does not.  Savage opposed the motion.  *See* Doc. 54, PageID.257-84; Doc. 57, PageID.301-16.[4]

The Court held that the SAA applies and dismissed Savage's FTCA claims.  *See Savage Servs. Corp. v. United States*, 522 F. Supp. 3d 1114, 1126 (S.D. Ala. 2021) [hereinafter *Savage II*], *aff'd*, 25 F.4th 925 (11th Cir. 2022).  This was proper because the FTCA "shall not apply to . . . any claim for which a remedy is provided by chapter 309 [the SAA] or 311 [the Public Vessels Act] of title 46 relating to claims or suits in admiralty against the United States."  28 U.S.C. § 2680(d); *see also Anderson v. United States*, 317 F.3d 1235, 1237 (11th Cir. 2003) ("[I]f admiralty jurisdiction exists for [plaintiff]'s claim, it cannot be brought under the FTCA."); *Miller v. United States*, 725 F.2d 1311, 1313 (11th Cir. 1984) ("an action brought under the DOHSA, a

---

[4] This set of briefs also addresses Savage's oil spill removal claims, as discussed below.

part of the SAA, cannot be maintained under FTCA because *jurisdiction under the FTCA and SAA are mutually exclusive*") (emphasis added).

**B.     Parties' Motions Addressing the Scope of the Oil Pollution Act of 1990**

The parties asked the Court to decide whether the SAA waives the United States' sovereign immunity for Savage's oil removal cost claims.  In the aforementioned partial motion to dismiss, the United States argued that it has not waived sovereign immunity for oil spill removal cost claims.  *See* Doc. 49, PageID.204-06; Doc. 50, PageID.207-30; Doc. 54, PageID.257-84); Doc. 57, PageID.301-16.  Savage filed an opposing motion for partial summary judgment, claiming that the United States waives its sovereign immunity through the SAA, thus allowing Savage's removal cost claims.  *See* Doc. 55, PageID.289-90; Doc. 55-1, PageID.291-96; 55-2, PageID.297-98.  The United States did not, however, seek dismissal of Savage's claims for other damages, e.g., barge repair, loss of use, or lost cargo, only removal costs.

Rejecting Savage's position, the Court, referring to the Oil Pollution Act of 1990 ("OPA"), held that "Congress has enacted a specific, detailed statute assigning responsibility for oil-spill cleanup costs (at the initial payee level, and beyond) that lacks any waiver of sovereign immunity applicable to the events pleaded in the Amended Complaint." *Savage II*, 522 F. Supp. 3d at 1123; *see also* 33 U.S.C. §§ 2701-62.  "In so doing, Congress has expressed its intent to effect an implied repeal of the general sovereign immunity provision in the SAA as it pertains to oil-spill cleanup damages." *Savage II*, 522 F. Supp. 3d at 1123.  "Savage is not permitted to look beyond the OPA to engraft a sovereign immunity waiver from a more general statute (in this case, the SAA) onto a more specific statute (here, the OPA), thereby supplying one that OPA's detailed remedial scheme does not." *Id*.

Savage filed an interlocutory appeal.  Affirming the Court's ruling, the Eleventh Circuit

found:

> OPA is a detailed and comprehensive framework for apportioning oil-spill liability. Through its many parts, Congress chose not to afford vessel owners any cause of action against the United States. Quite the contrary: It eliminated, as we've said, a provision—present in the OPA's predecessor statute—that would've allowed vessel owners to skirt liability in the case of governmental negligence. And it strayed from similar statutory schemes (like CERCLA and RCRA) that expressly allow for contribution claims against the federal government. The plain import of these unambiguous decisions, then, is that Congress has provided otherwise—by making clear that the Government is not liable for *oil-removal costs*.

*Savage Servs. Corp.*, 25 F.4th 925, 942 (11th Cir. 2022) [hereinafter *Savage III*) (emphasis added). The Eleventh Circuit denied Savage's application for rehearing *en banc*. Doc. 161. Savage did not seek a *writ of certiorari*. Docs. 167, 172.

On December 23, 2022, Savage filed a motion to clarify the scope of recoverable damages at trial, bringing the following OPA-related arguments: (1) that contamination of a vessel's hull with oil constitutes physical damage to a vessel, (2) that the general maritime law allows a vessel owner to recover the cost of repairing such damage, and (3) thus Savage can recover these costs from the United States. *See* Doc. 188, PageID.2127-2139.

In opposition, the United States argued that Savage's motion seeking "clarification" is, in effect, an untimely motion for partial summary judgment by another name. Doc. 191 at 5-6, PageID.2252-53. The United States further contended that these OPA arguments could and should have been raised in its earlier motion for partial summary judgment (Doc. 55) or in responding to the United States' partial motion to dismiss (Doc. 49), but were not. *Id*. at 6-9, PageID.2253-55. Both addressed OPA's application in this case. Had Savage believed that cleaning oil from its vessels' hulls remained a viable cost claim under the SAA notwithstanding OPA's passage, the United States argued, it could and should have made that argument earlier. Waived claims are not subject to review. *See United States v. Lewis*, 492 F.3d 1219, 1221 (11th Cir. 2007) (*en banc*).

Finally, the United States was of the view that Savage's motion should be denied on the merits. *Id*. at 8-19, PageID.2255-66.

On January 31, 2023,[5] the Court "clarified that the costs related to getting oil off the boat are not recoverable." *See* Doc. 218 at 3, PageID.2514. "The costs related to getting oil off the boat before removing the boat from quarantine are removal costs because oil removal was another necessary action to minimize damage to public health by ensuring that oil on the boat does not get into the water." *Id*. (citing 33 U.S.C. §§ 2701(30), 2702(31)).

**C.** **United States' Partial Motion for Summary Judgment for $151,657.78 in Costs Associated with Monitoring the Spill Cleanup**

The United States brought a counterclaim seeking reimbursement of $151,657.78 in oil spill removal costs (specifically, monitoring costs) incurred by the U.S. Coast Guard. Doc. 44 at 6-11, PageID.182-87. Savage declined to pay this charge, arguing that the accident which led to the spill was the United States' fault. The United States filed a motion for partial summary judgment, arguing that Savage's allegation of sole federal fault does not allay its responsibility to pay the costs at issue. Doc. 115, PageID.919-35. Savage opposed the motion. Doc. 130, PageID.1382-90.

The United States' motion rested on the Court's prior determination that the United States cannot be held liable for removal costs. *See generally Savage II*, 522 F. Supp. 3d 1114. The Court concluded that the ruling "is both controlling and dispositive." Doc. 175 at 2, PageID.1842. "Because the defendant has established, and the plaintiffs have conceded, the elements of liability, and because the plaintiffs' only defense to that liability has been conclusively rejected by the Eleventh Circuit, the defendant is entitled to partial summary judgment as to liability." *Id*. "In

---

[5] The Court made an oral order on the motion on January 31, 2023. That oral order was summarized in a written order on February 1, 2023. *See* Doc. 218.

summary, there is no genuine issue of material fact remaining, and the defendant is entitled to judgment as a matter of law on its counterclaim, in the entire amount claimed of $151,657.78. *Id*. at 3, PageID.1843. [T]he defendant's motion for partial summary judgment is granted. Entry of judgment will be delayed until final resolution of the plaintiffs' remaining claims." *Id*. Judgment has yet to be entered, due to the resolution of the remaining claims at the bench trial.

**D.    Savage' Motion for Summary Judgment on Liability**

Savage filed a summary judgment motion on the issue of liability, which sought a "ruling that the negligence of defendant United States of America was the sole cause of the accident at the center of this lawsuit." Doc. 116 at 1, PageID.1084; *see also* Doc. 117, PageID.1086-1106. The United States opposed the motion, Doc. 131, PageID.1391-1405, and Savage replied. Doc. 138, PageID.1663-74. The motion was denied. *See Savage I*, Civ. Act. No. 20-cv-0137-WS-N, --- F.Supp.3d ----, 2022 U.S. Dist. LEXIS 160030, 2022 WL 4086551, at *3.

**E.    The Parties' Dueling *Daubert* Motions**

Savage asked the Court "to preclude the expert opinions of Michael Berry, the navigational expert retained by defendant United States, from being entered into evidence." Doc. 121, PageID.1233-35. The United States opposed the motion, Doc. 127, PageID.1300-1307, and Savage replied. Doc. 139, PageID.1685-89. The United States filed its own *Daubert* motion, pointing out that the parties' liability experts were similarly situated. Savage opposed the United States' motion. Doc. 135.

The Court denied Savage's *Daubert* motion. *See Savage Servs. Corp. v. United States*, Civ. Act. No. 1:20-CV-137-TFM-N, 2023 U.S. Dist. LEXIS 4549, 2023 WL 145004, at *3 (S.D. Ala. Jan. 10, 2023) [hereinafter *Savage IV*]. In light of the denial, the United States moved to withdraw its *Daubert* motion, Doc. 198, PageID.2353-54, which the Court allowed. Doc. 199.

**F.    United States' Motion to Prohibit the Introduction of Evidence Derived from the Joint Investigation Performed by the National Transportation Safety Board and the United States Coast Guard**

The United States moved the Court to prohibit Savage from introducing evidence derived from the joint investigation performed by the National Transportation Safety Board ("NTSB") and the U.S. Coast Guard ("USCG"), and to prevent Savage's liability expert Captain William Beacom from offering opinions which improperly relied on such evidence.  *See* Doc. 123, PageID.1259-72; *see also* Doc. 130, PageID.1382-90; Doc. 140, PageID.1690-1701.  "The motion was granted in part and denied in part."  Doc. 218 at 1-2, PageID. 2512-13.  "It was granted to the extent that NTSB and USCG materials are being offered into evidence, including the interview transcripts." *Id*. at 2, PageID.2513. "The motion was denied as to the exclusion of Captain Beacom."  *Id*.

**G.    Savage's Motion to Prevent the United States from Raising Defenses or Legal Theories Not Set Forth Before the Close of Discovery**

Savage moved the Court to prevent the United States from raising what it described as defenses or legal theories not explicitly set forth by the United States before the close of discovery. *See* Doc. 177, PageID.1845-46; Doc. 177-1, PageID.1847-53.  The motion was denied.  Doc. 218 at 2, PageID.2513.

> The only examples of new 'defenses or legal theories' that Savage provides are the Pennsylvania Rule and the Oregon/Louisiana Rule.  These are burden shifting mechanisms of general maritime law, not defenses or legal theories.  Savage does not provide any other examples of new legal theories or defenses that the United States should be precluded from presenting.

*Id*.

**H.    Savage's Motion *in Limine* to Exclude Evidence**

Savage also moved the Court to bar the United States from "offering evidence to contradict its own testimony, rules and regulations . . . ."  Doc. 189 at 1, PageID.2145;  *see also* Doc. 189-1, PageID.2147-56.  Savage argued that as a matter of fact and law the government, not Savage, "had

the duty to ensure proper positioning, tight lines, and a safe configuration of the vessels." Doc. 218 at 3, PageID.2514. The motion was denied. Doc. 218 at 3, PageID.2514. In the Court's estimation, "Savage's argument goes to the weight, rather than the admissibility of the evidence. Savage's concerns can be addressed through the presentation of evidence and on cross examination." *Id*.

## I.   Savage's Additional Pretrial Objections and Motions *in Limine*

Savage also filed another motion in limine, which addressed various pieces of evidence. Doc. 204, PageID.2393-2402. The United States again opposed the motion. Doc. 207, PageID.2462-73. The Court addressed Savage's various requests in an oral order, with a written summary order that followed. Doc. 218 at 3, PageID.2514-15. The motion was ruled on prior to trial and the Court need not rehash its findings here.

## J.   United States' Motion *in Limine* Addressing Savage's Failure to Preserve Critical Video Evidence

The M/V Savage Voyager was equipped with three exterior cameras that were in operation before, during, and after the September 8, 2019 accident. It was also equipped with a recording device that captured this footage, which Savage did not preserve. Fortunately, the pilot in command at the time of the accident took it upon himself—unbeknownst to Savage—to return to the vessel about three weeks later and record portions of the playback with his personal smartphone, which he preserved and produced the day before his deposition.

The United States moved for sanctions under two separate subsections of Rule 37. The first, Subsection 37(b)(2), allows sanctions for disobeying a court order and the second, Subsection 37(e), allows sanctions for failing to preserve electronically stored information. *See* Doc. 184 at 1, 17, PageID.1915, 1931. The United States argued that Savage "had a duty to preserve and produce this video footage, but did not," and that "Savage's failure is detrimental to Defendant

United States' ability to defend the case against it and reduces the Court's ability to address factual issues determinative of liability."  Doc. 184 at 1, PageID.1915.

The Court ruled on the motion prior to trial.  The motion was granted in part and denied in part.  *See* Doc. 218 at 2, PageID.2513.   Specifically,

> [t]he motion was denied as to the cell phone recording of the lost video evidence. The motion was granted to the extent Savage [was] prohibited from introducing additional non-disclosed evidence regarding the water conditions in the lock chamber, other than the cell phone video.  The Court denied the United States' request for any monetary sanctions.

*Id.*

## III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having carefully considered evidence submitted at trial, and having studied the numerous exhibits, pleadings, and arguments of counsel, the Court now enters the following Findings of Fact and Conclusions of Law.

### A.  Findings of Fact

Plaintiffs are Savage Services Corporation and Savage Inland Marine, LLC (collectively, "Savage").  The United States of America is the defendant.

On September 8, 2019, the M/V Savage Voyager (the "Vessel") was pushing two tank barges, PBL 3422 and SMS30056, southbound toward the Jamie Whitten Lock on the Tennessee-Tombigbee Waterway ("Tenn-Tom" or "Waterway").  The Savage Voyager's crew of six was divided into two groups of three, each with a captain or pilot, a tankerman, and a deckhand.  The crew members worked six-hours on, six hours off.  The pilot, Dalton "Chip" Ellis, had been credentialed by the U.S. Coast Guard for twenty-two years and had worked for Savage about six months.  The tankerman, Hunter Middleton, had been with the company for over two years, and

the deckhand, Caleb Beasley, about a year.  All three commonly worked on the Savage Voyager and routinely transited the Jamie Whitten Lock.

As the Eleventh Circuit observed, the Tenn-Tom is a "manmade system of canals, locks, and dams linking the Tennessee River in Mississippi with the Tombigbee River in Alabama." *Savage III.*, 25 F.4th at 928.  The Waterway has ten locks, including the Jamie Whitten Lock & Dam, all operated by the United States Army Corps of Engineers.  Each of these locks houses a chamber that is 600 feet long and 110 feet wide.  The Jamie Whitten Lock and Dam, completed in 1983, is located on the Tennessee-Tombigbee Waterway at mile 411.9.[6]  It opened for business in 1985, after other infrastructure on the Tenn-Tom was complete.  Like other such facilities, the Jamie Whitten Lock and Dam controls the upper pool depth to create a navigable waterway system, which ensures that the water's depth is sufficient to accommodate vessels like the Savage Voyager and its barges.

Savage owned and operated M/V Savage Voyager and tank barges PBL 3422 and SMS 30056.  Neither barge was self-propelled, and at all relevant times both were physically controlled by the Savage Voyager and her crew.  The Savage Voyager is an 83.5-foot-long towing vessel built in 2014.  *See* U.S. Trial Exhibit 16.  Each of its barges was 297.5-feet-long, giving them a combined length of 595 feet.

During the early morning hours of September 8, 2019, at approximately 3:30 a.m., the M/V Savage Voyager headed southbound on the Tennessee-Tombigbee waterway, on approach to the Jamie Whitten.  The vessel was under the command of Pilot Dalton "Chip" Ellis, who was assisted by Tankerman Hunter Middleton and Deckhand Caleb Beasley. The towboat and barges approached the Jamie Whitten facility arranged end-to-end, with barge SMS 30056 out in front,

---

[6] Originally the facility was called the Bay Springs Lock and Dam, however, it became the Jamie Whitten in 1997.

barge PBL 3422 in the middle, and the Savage Voyager pushing from behind. The flotilla's total length was 678.5 feet.

Around 3:30 a.m., Ellis called the Jamie Whitten's lock operator by VHF radio and sought permission to perform a downbound "knockout single" lockage. Lock Operator Bobby Pharr returned the call, gave permission and said that he would ready the chamber for their arrival at the gate. Deckhand Beasley and Tankerman Middleton emerged from the towboat, taking positions on the port and starboard bow of the forward barge, SMS 30056. Using handheld VHF radios, they were Ellis's eyes and ears as he guided the flotilla into the lock chamber. The frequency on which they spoke with Ellis was different than that on which Ellis spoke with the lock operator. In other words, the lock operator had no direct communication with the deckhands. As the bow of the lead barge cleared the upper gates and entered the chamber, Beasley began making his way to the stern of the tow to tie a line to a bitt on the lock wall.

To be in a safe position for lockage, the tow had to be situated to the inside of (or downstream from) a twelve-inch-wide vertical yellow warning line painted on the lock wall directly above a sill at the foot of the miter gates through which the flotilla had entered. The yellow line can be seen in the photograph below:



*Figure 2 (U.S. Trial Exhibit 34)*

The tankerman and deckhand tied off the barges, also called a "tow," to floating mooring bitts that ride up and down in vertical channels in the lock chamber's wall. The bitts operated properly on the day in question; they did not "hang" or otherwise malfunction. Specifically, Tankerman Middleton tied off a "two-part" lead at the head of the tow, meaning that two separate lengths of line extended back and forth between barge and bitt, securing one to the other. If done correctly (and if not overcome by an external force), this kind of arrangement should keep a tow from traveling forward in the chamber.

To the best of Middleton's recollection, Beasley told him by VHF radio that the tow was not inside the vertical yellow line, and the crew needed to move the tow forward a foot or more to get into the proper position. Beasley, however, does not share this recollection.[7]

Using the towboat's engines to apply force, Ellis pushed into the bow lead, creating a "tight line." According to Savage's expert on mooring lines, the average person has only enough strength to put about 90 pounds of tension into a line. Using the vessel's engines, however, the pilot could put the bow lead under far greater tension. As Ellis held the bow lead tight, Beasley tied off a two-part lead at the tow's stern, which if done correctly (and if not overcome by an external force) should prevent the barges from drifting astern, which is its purpose. The lock operators at the Jamie Whitten and the other Tenn-Tom locks do not handle vessel lines, and Lock Operator Bobby Pharr did not handle lines on September 8, 2019. All line-handling is done by vessel crews, using lines that belong to the vessel.

The lock chamber is 600-feet-long, the barges together measured 595 in length, and the towboat was 84-feet-long. To get them in together, so they could lock through as a group, the crew performed a "knockout," which means that the towboat was disconnected from behind the barges, brought alongside, and in the vernacular of the industry, put on the "hip" of PBL 3422. Ellis instructed Beasley to "unface" the vessel, allowing Ellis to bring the vessel from behind and place it alongside PBL 3422. Once the towboat was on the hip of PBL 3422, Beasley lashed M/V Savage Voyager abreast it by looping a line around fittings on the towboat and barge, which he called a "donut" line. With the towboat tied off in this new position, Beasley returned to his post

---

[7] The discrepancy has no effect. As discussed below, all four eyewitnesses concur in the view that the tow was in the correct location before the locking process was initiated. It makes little difference whether the tow's position had to be adjusted, as any adjustment would be unrelated to the accident's cause.

at the corner of PBL 3422 to tend his stern line.  Here we see an aerial view of the Savage Voyager and its barges in the Jamie Whitten's chamber:



*Figure 3 (U.S. Trial Exhibit 33)*

With Beasley in position, Ellis radioed Pharr, and said they were ready to proceed.

There are two sets of valves at Jamie Whitten, upper filling valves and lower emptying valves.  The water is moved by gravity, not pumps.  Pharr pushed a button on his console, opening the large valves that drain the lock chamber which began the dewatering process.  The process is largely automatic; the valves open and water drains at approximately the same rate every time.

Three and a half to four minutes into the lockage, the rake end of PBL3422 became caught on the north miter sill, which is submerged when the lock is full.  Beasley radioed Ellis, who in turn radioed the lock operator on a separate channel, to ask that he stop the lockage.  Due to the facility's design, however, the valves do not immediately close.  In an effort to pull PBL 3422 off of the sill, Ellis came full ahead on both engines.  As the water in the chamber continued to fall, the rake end of PBL3422 remained hung on the sill, lifting barge PBL 3422 from the water, until it buckled under its own weight.  The deckhand jumped aboard the towboat shortly before PBL

3422 dropped from the sill.  Barge PBL-3422 ruptured, and approximately 117,000 gallons of crude oil were released into the lock chamber.

After the accident, the Army Corps performed testing to determine the rate at which water drained from the lock chamber.  *See* U.S. Trial Exhibit 11.  The resulting discharge rate was applied to the headwater level at the time of the accident to calculate how long it took for the water to drop from the upstream level to the sill.  Calculations show that on September 8, 2019, it took three minutes and fifty-five seconds, which generally coincides with events captured by a forward-facing camera on the towboat, i.e., Ellis's cell phone footage.  *See* U.S. Trial Exhibit 25.

The United States' liability expert, Captain Michael Berry, came to three opinions in his original report, which he explained at trial:

> a.     Opinion 1.  Pharr in no way caused the incident that occurred on September 8, 2019, involving the M/V Savage Voyager and Jamie Whitten Lock and Dam.

> b.     Opinion 2.  The stern line on the PBL 3422 had too much slack in it, which allowed the barge to drift back and hang on the miter sill.

> c.     Opinion 3.  Pharr oversees the operation at the lock, but he is not in charge of the vessel crew and or the actions taken by them. Pharr relied on Ellis's word the tow was in the correct position, and they were ready to go.  Pharr verified this, and in no way is he responsible for duties of the vessel deck crew after the locking process had started.

Captain Berry's opinions were based, in part, on Pilot Ellis's deposition testimony.  Ellis testified at deposition that at all relevant times he had the towboat's engines engaged, constantly pushing the barges forward and away from the sill.  The deposition testimony was read into the record at trial.

> A.     I stayed knuckled in and/or dogged in, as we call it, to make sure that the tow stayed not only flat against the wall but also shoved forward into our towing lead that was on the head.  I let the lock master know that we were secure, that I was broke out and that I was secure alongside my tow, and he began to --

> Q.     Did you tell him you were in the correct position?  Did that come up?

> A.     I told him that I was inside the position of where we needed to be inside the locks according to where we normally lock, yes.

Pilot Dalton "Chip" Ellis, Dep. 51:9-21.

Ellis further testified at deposition that his propellers were generating only forward force, and that—notwithstanding their force—the towboat and barges were pushed backward by "wave action" in the lock chamber:

> Q.     Can you tell the Court which direction your propellers were causing force to go?
>
> A.     Forward motion to keep the towing line tight.
>
> Q.     So not only were you not going astern, you were actually generating force going forward?
>
> A.     That is correct.
>
> Q.     So if the PBL barge was to back up during the transit, some outward force had to act upon it, and it had to be sufficient to overcome the force that you were imposing with your props?
>
> A.     That is correct.
>
> Q.     Did something other than your props cause the PBL barge to move?
>
> A.     It would have had to been the motion of the water.
>
> Q.     Okay.  And then, I mean, I think we saw some of it during the videos. Obviously, during the event itself, once there's some wave action happening, the barges and your tug were being moved by that wave action, correct?
>
> A.     That is correct.

*Id*. 131:25-132:20.  But Ellis testified differently at trial.  There he admitted that he had the towboat's propellers generating some amount of astern force:

> Q.     At any time did you do anything with the PBL barge -- excuse me -- did you do anything with the tug that would cause the PBL barge to move astern?

A.   No, sir.

Q.   Which direction were your props turning?

A.   I was -- I was more forward in my wheel wash than I was stern, *I was clutch astern*, I was much more on my forward and my dog motion to hold me up against the side of the barges.

Ellis Trial Testimony 53:23-54:5 (emphasis added). This change in the facts led Captain Berry to reconsider his second opinion, in particular, that "[t]he stern line on the PBL 3422 had too much slack in it, which allowed the barge to drift back and hang on the miter sill." Berry concluded, instead, that the pilot's handling of the towboat in the lock chamber's close quarters inadvertently pushed the tow back into the stern lead and over the sill on which it became snagged.

Savage disputes that there was a change in Ellis' testimony. However, it is clear from Ellis' elaboration at his deposition testimony that he stated he was not going astern and had all engines going forward. Then, at trial, he stated that he was clutch astern. While the Court finds Captain Berry's new opinion to be the most logical explanation of how the M/V Savage Voyager hung up on the miter sill in light of all the facts, the Court's finding of liability for the accident would remain the same whether under Captain Berry's new opinion or under his original opinion, as explained further in the Conclusions of Law.

Relevant to the missing video footage, it should be noted that at the time of the accident, the Savage Voyager was fitted with three exterior cameras:

  

*Figure 4 (Camera 1, On top of the wheelhouse facing forward; Camera 2, Facing down the center cavel; Camera 5, Lower bow, below fleet deck)*

Footage from these cameras was transmitted to a monitor in the vessel's wheelhouse, which the crew also knew. In addition to being depicted on the wheelhouse monitor, the footage was captured by a digital video recorder (DVR):



*Figure 5 (DVR photos, subpoena return, Kirby Corp., current vessel owner)*

The U.S. Coast Guard responded to the incident and directed cleanup efforts. The lock and four miles of the Tennessee-Tombigbee Waterway were closed for 18 days while the lock chamber was decontaminated. The owner and operator of the towboat and barges, Savage Services

Corporation and Savage Inland Marine, LLC, were deemed responsible parties under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701-61, and, as such, paid the bulk of oil removal costs.

Consummating a deal that had been in the works, Kirby Corporation (unrelated to Savage) bought the Savage Voyager, along with the rest of Savage's inland towing business about six months after the accident.[8]  Title to the vessel was transferred on March 31, 2020.  *See* Doc. 184-13 (USCG Vessel Documentation) at 2, PageID.2019.  Thus, after the September 8, 2019 accident, the Savage Voyager remained in Savage's "possession, custody, or control," per Fed. R. Civ. P. 34(a), for another six months and twenty-three days, i.e., more than half a year.

**B.     Conclusions of Law**

**i.     Jurisdiction and Venue**

This is an admiralty action and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Doc. 190 at 1, PageID:2204.  Accordingly, the district court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1333 (admiralty and maritime jurisdiction).  Additionally, Savage's spill removal cost claims present a federal question within the ambit of 33 U.S.C. § 1331.  *See* 33 U.S.C. § 2717(b) ("Except as provided in subsections (a) [Review of regulations] and (c) [State court jurisdiction], the United States district courts shall have exclusive original jurisdiction over all controversies arising under this Act [*i.e.*, the Oil Pollution Act of 1990], without regard to the citizenship of the parties or the amount in

---

[8] According to a January 30, 2020 press report, "Houston-headquartered Kirby Corporation . . . acquire[d] the inland tank barge and towboat fleet of Savage Inland Marine for approximately $278 million in cash and the assumption of leases." https://www.marinelog.com/coastal/inland/kirby-to-acquire-savage-tank-barge-and-towboat-fleet/ (accessed Mar. 22, 2023).  Similar information is available on Savage's website:  "Savage confirms the agreement announced today by Kirby Corporation to purchase our inland tank barge fleet, consisting of 90 inland tank barges and 46 inland towboats, along with other assets." https://www.savageservices.com/savage-statement-on-agreement-to-sell-inland-marine-assets-to-kirby/ (accessed Mar. 22, 2023).

controversy."); *see also In re Oil Spill*, 98 F. Supp. 3d. 872, 878 (E.D. La. 2015) ("Section 2717(b) provides federal district courts with jurisdiction over OPA claims, without any reference to admiralty . . . ."). The Court has jurisdiction over the United States' counterclaim. *See* 28 U.S.C. § 1345 ("Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.").

### ii. The September 8, 2019 Accident Giving Rise to this Case Was Caused Solely by the Vessel Crew's Mishandling of the M/V Savage Voyager and Her Barges

The parties' motion practice, and the Court's resolution of the various motions, leaves only the determination of liability for the September 8, 2019 accident. Generally speaking, claims within the Court's admiralty jurisdiction are governed by substantive admiralty law. *E. River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858, 864, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986). In admiralty cases, federal courts allocate damages based upon the parties' respective degrees of fault. *United States v. Reliable Transfer Co*., 421 U.S. 397, 411, 95 S. Ct. 1708, 44 L. Ed. 2d 251 (1975) (supplanting the divided damages rule with comparative fault as the measure for allocating damages in vessel collision cases); *see also Smith & Kelly Co. v. S/S Concordia TADJ*, 718 F.2d 1022, 1029 (11th Cir. 1983) (applying *Reliable Transfer*).

Savage relies on the "last clear chance" doctrine to argue that, as a matter of law, the duty to ensure that vessels are properly positioned in the lock chamber prior to lockage lies solely with the lock operator. *See* Doc. 189-1 at 3, PageID.2149 (citing *Montgomery v. United States*, Civ. Act. No. 1:09-cv-123-WS, 2010 U.S. Dist. LEXIS 98090, 2010 WL 3748141, at *5 (S.D. Ala. Sept. 17, 2010) (allowing for liability on a defendant's part, despite plaintiff's negligence, where defendant had the "last clear chance" to avoid an accident)). Savage reasons that "the Lock Operator is the sole individual with access to the controls that start the dewatering process.

Therefore, the Lock Operator has the 'last clear chance' to avoid any potential accidents caused by improper positioning of the vessel." The same could be said of the pilot, however, which leads the Court to reject the argument. In other words, just as the lock operator was the only person at the lock controls during the early morning hours of September 8, 2019, so too the pilot was the only person at the towboat's controls. As discussed below, the Court finds the towboat's mishandling to be the principal cause of the accident.

Savage also relies on a regulatory provision to argue that the lock operator—to the exclusion of vessel crew—has full authority over his lock and thus the whole of any duty to ensure that the rules and regulations related to the movement and mooring of vessels are followed. Savage's focus falls on a Code of Federal Regulations provision that pertains to navigation and navigable waters, which provides:

> The lockmaster shall be charged with the immediate control and management of the lock, and of the area set aside as the lock area, including the lock approach channels. He/she shall see that all laws, rules, and regulations for the use of the lock and lock area are duly complied with, to which end he/she is authorized to give all necessary orders and directions in accordance therewith, both to employees of the government and to any and every person within the limits of the lock and lock area, whether navigating the lock or not. No one shall cause any movement of any vessel, boat, or other floating thing in the lock or approaches except by or under the direction of the lockmaster or his/her assistants. . . .

Doc. 39 ¶ 14 (quoting 33 C.F.R. § 207.300(a)).

Savage highlights another passage from the same regulation:

> All vessels when in the locks shall be moored as directed by the lockmaster. Vessels shall be moored with bow and stern lines leading in opposite directions to prevent the vessel from "running" in the lock. All vessels will have one additional line available on the head of the tow for emergency use. The pilothouse shall be attended by qualified personnel during the entire locking procedure. When the vessel is securely moored, the pilot shall not cause movement of the propellers except in emergency or unless directed by the lockmaster. Tying to lock ladders is strictly prohibited.

*Id*. at ¶ 15 (quoting 33 C.F.R. § 207.300(m)(1)(i)).  Savage asserts that Section 207.300 places all responsibility for the accident on the lock operator as a matter of law.  In so doing, Savage disregards other language from the same regulation that undercuts its preferred reading: "[t]he restrictions and admonitions contained in these regulations shall not affect the liability of the owners and operators of floating craft for any damage to locks or other structures caused by the operation of such craft."  33 C.F.R. § 207.300(q).  The Court is bound by the regulation's words.  *See Savage III*, 25 F.4th at 933 ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").  Given that owners and operators of floating craft—such as M/V Savage Voyager, SMS 30056, and PBL 3422—remain responsible for damage to damage to locks or other structures, notwithstanding the existence of 33 C.F.R. §§ 207.300(a), (m)(1)(i), it follows that they remain liable for their own damages as well.

Furthermore, the Court notes that Savage is not the first party to make this argument; others have urged federal courts to accept exactly the reading of 33 C.F.R. § 207.300 that Savage advances, yet, and with good reason, no court has accepted the offer.  In *Logan Charter Service, Inc. v. Cargill, Inc*., 373 F.2d 54 (8th Cir. 1967), a tow collided with a lock and dam on the Mississippi River.  Relying on 33 C.F.R. § 207.300, the plaintiff argued—as does Savage here—that the lock operators are in charge of the navigation of the tow and flotilla.  *Id*. at 60.  Rejecting the argument, the Eighth Circuit held instead that "[a] reading of the other regulations makes it clear that this regulation was not designed to absolve the crew of an approaching vessel from negligence."  *Id*. at 61.  That court pointed out that "[t]he regulations specifically provide that they shall not affect the liability of the owners and operators for any damage caused by the operations to locks or other structures."  *Id*.  The *Logan Charter* court concluded that lock operators can "not

be held responsible for the crew's failure to maneuver the flotilla into proper position to enter the lock." *Logan Charter*, 373 F.2d at 61.

Similarly, the plaintiff in *Alter Co. v. United States*, 412 F. Supp. 73, 79-80 (S.D. Iowa 1976), argued that 33 C.F.R. § 207.300 "imposes a duty upon lock operators to give proper and safe navigational orders and that any negligent order should result in liability being placed upon the government commensurate with its negligence." Like Savage, that plaintiff focused on the fact that "navigators are duty bound to obey all navigational orders of lock operators." *Id*. at 80. Nonetheless, the *Alter Co*. court observed that the regulation "indicates that vessel pilots are not to be relieved from the consequences of their own negligence." *Id*. at 82; *see also id*. at 80 ("The Court cannot reach the conclusion that pilots are bound to follow unquestioningly and unhesitatingly navigational orders given by lockmen.").

In *Chotin Transp., Inc. v. United States*, 784 F.2d 206, 207-08 (6th Cir. 1986), a tug and barge struck a lift gate during locking. The district court found the owner and the government each fifty percent liable, which was affirmed on appeal. *Id*. at 209, 212. The *Chotin* decision further confirms that lock operators do not assume control over vessels and crews in lock chambers.

In sum, the pilot, tankerman, and deckhand of M/V Savage Voyager did not tender their duties by entering the lock chamber, nor did they leave their responsibilities at the miter gate. Placing all blame on the United States, Savage alleges that the lock operator "abdicated his duties to immediately control and manage the locking procedure." Doc. 39 ¶ 17. According to Savage, "[h]is negligent performance of his normal, routine duty to operate the Jamie Whitten Lock was the sole proximate cause of the damage to the PBL barge 3422." *Id*. "The damage to PBL barge 3422 was not caused by any fault, neglect or lack of due care on the part of Savage, or any

individuals for whom it was responsible; nor was it caused by any unseaworthiness of the M/V SAVAGE VOYAGER or PBL 3422." *Id.* The Court disagrees.

Under the general maritime law, "[t]hose in control of the vessel's navigation must bear the greater responsibility for bringing their ship safely into and out of port." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 802 (5th Cir. 1977)).[9] This remains true when a towboat maneuvers in and around a lock and dam. "A pilot 'is liable for any accident that due care and attention, and the knowledge of existing conditions and circumstances, which he had, or is supposed or charged to have had, might have avoided.'" *Id.* (quoting *The Dora Allison*, 213 F. 645, 646 (S.D. Ala. 1914)).

According to Savage, "[t]he lock operator, an employee of the United States through the Army Corps of Engineers, did not leave the control room, or advise the crew to move." Doc. 200 (Order on Pretrial Hearing) at 2. The Court does not credit this assertion, but finds instead that the lock operator did leave his station inside the control room, walked outside, and checked to ensure that no water was coming in between the upstream gates (i.e., checked the "miter" or "the seal") and while there saw PBL 3422 to be properly inside the vertical yellow warning line.

Savage also argues that tows usually move back and forth in the Jamie Whitten lock chamber, one to two feet in either direction. According to Savage, the lock operator knew this and yet allowed the crew of the Savage Voyager to moor its tow six to eight inches from the miter sill. The Court finds otherwise. The entire towboat crew states that the tow was in position inside the yellow line. According to Pilot Ellis, they were about a foot and a half from the yellow warning line. As the line is painted, it extends six inches to the inside of the sill. If we add that six inches

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit that were announced prior to October 1, 1981.

to the pilot's foot and a half or thereabouts, the tow was roughly two feet from the sill when dewatering began.  Savage contends that, armed with this knowledge, Lock Operator Pharr should have told Pilot Ellis to tie his tow off further from the sill; however, Ellis had transited the lock as pilot at least 250 times before September 8, 2019.  He testified that from the wheelhouse he could see the yellow line and the barges' relative position to it.  Ellis and his crew knew the length of the tow and that of the lock chamber.  Even if Savage is correct about the tow's distance from the sill, the towboat crew was equally familiar with distances and dynamics in the lock chamber.

The Court finds that the theory advanced by Captain Berry best takes into account the evidence at hand, resolving consistencies and inconsistencies.  For example, Deckhand Caleb Beasley could not fathom how barge PBL 3422, which he had seen with his own eyes to be forward of the vertical yellow warning line before dewatering, had moved backward over the sill, even as his stern line remained taut:

> Q.   And so my question is, if the line was tight, I believe that was your testimony, and you were inside 9 the yellow mark, how did it get on the sill?
>
> A.   I don't know.
>
> Q.   I mean, the stern line is what's supposed to keep it from moving backwards, right, the barge?
>
> A.   Uh-huh.
>
> Q.   And, obviously, that didn't happen. It moved back some distance, right?
>
> A.   It didn't move -- from my understanding, it didn't move back and I'm 110 percent sure that my backing line was tight, so as far as how it got on the sill, I can't answer that.
>
> Q.   You don't know?
>
> A.   No, sir.

Deckhand Caleb Beasley Dep. & Trial Testimony 69:7-21.[10]

    2.    Tankerman Hunter Middleton was equally perplexed:

Q.    Did you and Caleb Beasley have a discussion as to what happened that could have caused this accident?

A.    We were basically startled.  We didn't know what happened because everything was in normal parameters.  Everything was normal on our end.  But anything outside of that we didn't really talk about.

Q.    Because when you were both at the stage where both of your lines were affixed, you were both within the yellow lines that were the parameters which the vessel had to be; is that correct?

A.    Yes.

Q.    And, at some point, obviously, the PBL got hung up, so it had to be outside of the yellow line.  And I'm just trying to understand, did you and Caleb ever have a discussion as to why that happened or how that happened?

MR. CRAWFORD:  Asked and answered.  You can answer again.

A.    We just had the same discussion, as I said before, just didn't know why or how. I don't know any other discussions we had at all.

BY MS. BRADY:

Q.    So the only discussion you had with Caleb was that you both agreed you didn't know why or how; is that correct?

A.    Right.  We were just in astonishment, basically with the situation at the time.  That's all I have on that.

Tankerman Hunter Middleton Dep. 98:5-99:9.

Captain Berry testified at trial, which the Court accepts, that Ellis accidently pushed into the tow's stern lead, moving it backward over the sill.  And **even if that theory had not been**

---

[10] As Tankerman Hunter Middleton and Deckhand Caleb Beasley did not appear live at trial, their trial testimony derives from their deposition testimony, which was recorded and played via video at trial.

presented,[11] the Court would still find itself compelled to rule in the United States' favor.  On September 8, 2019, locking operations began with twenty-three feet of water above the upper gate miter sill.  The tow's length measured 595 feet in a 600-foot lock chamber, leaving little room for error.  **Every eyewitness—the lock operator and also the towboat's pilot, tankerman, and deckhand—maintains that the tow was inside the yellow line prior to dewatering.**  The crew of the Savage Voyager tied the barges off to the lock wall, not the lock operator.  The pilot operated the towboat, and no one else.  Whether the tow moved because of something Pilot Ellis did, or whether it moved due to slack in the line or some other reason, it was the responsibility of the Savage crew.

When a moving vessel strikes a fixed object, that vessel is presumed to be at fault.  *The Oregon*, 158 U.S. 186, 15 S. Ct. 804, 39 L. Ed. 943 (1895).  "The presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the moving vessel is mishandled in some way."  *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 923 (11th Cir. 2001).  "Not unlike the doctrine of *res ipsa loquitur*, the *Oregon Rule* creates a *prima facie* case of negligence . . . ."  *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 362 (6th Cir. 2010).

The *Louisiana Rule* derives from *The Louisiana*, 70 U.S. 164, 3 Wall. 164, 18 L. Ed. 85 (1866).  It is similar in effect to the *Oregon Rule*, but applies to vessels that move or drift due in response to an external force, such as wind or current.  Otherwise, there is no difference.  *See City*

---

[11] The Court emphasizes this point because Savage hotly contested the United States' introduction of Captain Berry's new opinion.  However, the introduction of his new opinion makes no difference in the outcome of this case.  While Captain Berry's new opinion appears to offer the most logical explanation as to how the barge became hung up on the miter sill, without it the Court would still find for the United States, applying Captain Berry's original opinion.  Given that all eyewitnesses said the barge was in front of the yellow line when locking began, the only way it could have become hung up on the miter sill is at the fault of Savage.

*of Chicago v. M/V MORGAN*, 375 F.3d 563, 573 n.11 (7th Cir. 2004) ("We agree . . . that whether the [vessel] is deemed 'drifting' and therefore subject to the *Louisiana* presumption of fault . . . or 'under power' and subject to the *Oregon* rule, our analysis remains unchanged.").

As another court explained in a separate lock and dam case, "[a]dmiralty law recognizes several rebuttable presumptions." *Great Am. Ins. Co. v. United States*, 552 F. Supp. 2d 703, 709-10 (S.D. Ohio 2008). "The 'Oregon Rule' is a presumption of liability or fault." *Id.* "It holds that if a moving vessel collides with a stationary object, such as a dock or a navigational aid, the moving vessel is presumed to be at fault." *Id.* (citing *The Oregon*, 158 U.S. 186, 192 (1895)).

### iii. Savage Spoliated Video Footage Captured by the M/V Savage Voyager's Cameras, However, Pilot Ellis Restored It, Which Is Sufficient for the Court to Decide this Case on the Merits

The Court previously found that Savage breached its duty to preserve video evidence. *See* Doc. 218 at 2-3. PageID.2513-14. Additionally, the U.S. Coast Guard promulgated regulations regarding the preservation of evidence that apply in the event of a marine casualty, which is defined as "any occurrence involving a vessel which results in damage by or to the vessel . . . which might affect or impair the seaworthiness of the vessel." 46 C.F.R. § 4.05-15(a). Unquestionably, the September 8, 2019 accident affected the seaworthiness of barge PBL-3422. Accordingly, Savage was required to maintain records that might be of assistance in determining the cause of the accident:

> The owner, agent, master, or person in charge of any vessel involved in a marine casualty shall retain such voyage records as are maintained by the vessel, such as both rough and smooth deck and engine room logs, bell books, navigation charts, navigation work books, compass deviation cards, gyro records, stowage plans, records of draft, aids to mariners, night order books, radiograms sent and received, radio logs, crew and passenger lists, articles of shipment, official logs and *other material which might be of assistance in investigating and determining the cause of the casualty*. . . .

46 C.F.R. § 4.05-15 (Voyage records, retention of) (emphasis added).

The Court also found that the footage that Savage failed to preserve was restored by its pilot who produced that footage the day before his deposition.  The Court had the opportunity to see and reflect upon the footage firsthand, as it was played multiple times during the trial, while witnesses were questioned by both parties as to its content.  Without a doubt, Ellis's re-recording is of less than ideal quality.  It includes only certain segments, those of his choosing.  It is of poor quality.  And the synchronization between the three separate camera views, linking them in time, was lost.[12]   From Ellis's cell phone, we have the grainy image below, a screenshot showing the positions of the towboat and barges in the lock chamber moments before the accident, which comes from Ellis's re-recording of the original video footage:

---

[12] Ellis managed to preserve nine separate segments of footage that are "admittedly of lesser resolution than the original."  Doc. 195 at 2, PageID.2282.  The parts do not make up to the whole, but are instead limited to segments that Ellis recorded for his own purposes.  *See id*. at 6, PageID.2286 ("Ellis advised he made the recording just in case he ever needed to back up his recollection of events, *i.e*., that he had done nothing wrong on the night of the Accident.").



*Figure 6 (Pilot Ellis's cell phone image of the scene in the lock chamber, before the accident)*

Despite its shortcomings, the Court finds that the lost video footage was sufficiently replaced by Pilot Ellis's limited cellphone copy to obviate the need for curative measures under Rule 37(e). *See DR Distributors*, 513 F. Supp. 3d at 958. Put differently, there was more than enough evidence available for the Court to decide the case on its merits.

For example, Savage suggests that "evidence establishes that the surging that causes vessels to move in locks occurs nine to ten feet below the surface of the water and that those underwater forces would not be reflected in any video taken from a vessel." Doc. 195, PageID.2282. If the M/V Savage Voyager were actually buffeted by underwater currents, footage would show the movement of the boat and barges in relation to the walls of the surrounding lock chamber. Yet the video, which everyone in the courtroom watched several times, shows no

discernible movement on the part of either the towboat or its barges.  The vessels do not move until barge PBL 3422 drops from the sill.  The Court finds therefore that there was no significant amount of surge and that the water's force—whatever force there was—did not cause the September 8, 2019 accident.

Pilot Ellis testified that they moved the tow up at one point, which indicates that he understood the necessity to keep the tow forward of the yellow line.  In paying more attention to his tow than to the lock wall, however, Ellis could easily have lost sight, and did lose sight on this occasion.  He did not realize what was happening and, as he did not, he failed to check the barges' rearward drift.

The Court credits and finds the testimony from Pilot Ellis expressing remorse at this incident to show consciousness of fault.  Pilot Ellis did not intend for this to occur.  No one did.  Certainly, if Ellis had it to do it over again, he would do things differently.  But in the final analysis, the situation was within his control.

Ultimately, because all witnesses agree that the M/V Savage Voyager was in the correct position when the lock operator began dewatering, because the lock was operating normally during the incident, and because the vessel was under the control of the Savage crew at the time of the incident, the Court finds in favor of the United States.

## IV.   CONCLUSION

Based on the foregoing, the Court finds in favor of the United States as to all claims before the Court.  A separate judgment will be entered.

**DONE** and **ORDERED** this the 23rd day of March, 2023.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE